# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 10-1499

_____

| | | |
|---|---|---|
| In re: Larry Weldon Treadwell; Carole Elaine Treadwell, | * | |
| | * | |
| | * | |
| Debtors. | * | |
| _____ | * | |
| | * | |
| Larry Weldon Treadwell; Carole Elaine Treadwell, | * | |
| | * | |
| | * | |
| Appellees, | * | |
| | * | Appeal from the United States |
| v. | * | Bankruptcy Appellate Panel |
| | * | for the Eighth Circuit. |
| Glenstone Lodge, Inc., | * | |
| | * | |
| Appellant. | * | |

_____

Submitted: September 21, 2010
Filed: March 9, 2011

_____

Before RILEY, Chief Judge, MELLOY and COLLOTON, Circuit Judges.

_____

RILEY, Chief Judge.

Larry Weldon Treadwell and his wife, Carole Elaine Treadwell, arranged and presented a Red Hat Society event for hundreds of women at Glenstone Lodge, Inc. (Glenstone) in Gatlinburg, Tennessee. The Treadwells promised to pay the hotel bill, but skipped town without paying. As a result, the Treadwells owe Glenstone over

$150,000.  When Glenstone tried to foreclose on the Treadwells' Missouri home to satisfy the debt, the Treadwells filed for Chapter 7 bankruptcy.  As relevant here, the bankruptcy court discharged Larry's debt to Glenstone.  The Bankruptcy Appellate Panel for the Eighth Circuit (BAP) affirmed.  Glenstone appeals.  We reverse and remand to the bankruptcy court for further proceedings.

## I.    BACKGROUND

### A.    Gaitlinburg Spring Fling

In 2003, the Treadwells registered Memory Travel as a fictitious name with the Missouri Secretary of State's Corporations Division.  See Mo. Rev. Stat. § 417.210 (2001).  The registration form, which the Treadwells ostensibly signed,[1] reflects that Larry and Carole each owned 50% of Memory Travel.  The form lists the Treadwells' home in Branson, Missouri, as Memory Travel's business address.

In 2005, Memory Travel advertised the Gatlinburg Spring Fling (Fling) to members of the Red Hat Society (Redhatters), "a corporation with social chapters, primarily for women over age fifty, which organizes events and gatherings for its members around the country."  Redhatters are known to dress flamboyantly in large red hats and red and purple clothes.  The Fling included a luau with hula dancers, a sock hop with band, a fashion show, an Elvis impersonator, cloggers, and "Jimmy Buffett style" entertainment.

Although the Red Hat Society did not sanction the Fling, Carole testified Memory Travel was allowed to use the Red Hat Society's logo in its promotional materials because Carole is Queen of the Red Hat Society's Dixie Ladybugs Chapter.

---

[1]Carole testified she forged Larry's signature on the registration form, which required statements to be made "subject to the penalties of a false declaration under [Mo. Rev. Stat. § 575.060 (1986)]."  Larry testified he recognized his signature on the form but then recanted, averring Carole "can sign [his] name better than [Larry] can and [the signature] just looks too neat."

In April 2005, Carole contacted the Gatlinburg Department of Tourism to find a facility to host the Fling. The Department contacted local hotels with sufficient lodging and meeting space to accommodate 200 to 250 Redhatters in early 2006. One of these hotels was the Glenstone Lodge. During contract negotiations with Glenstone, Carole insisted Redhatters "book through me" and promised to pay Glenstone "via one check" for services provided.

In June 2005, Memory Travel and Glenstone entered into a written contract, which Carole and Glenstone's Director of Sales, Claudette Geoffrion, signed. In exchange for $77 per room per night (room-night), Glenstone agreed to set aside 150 room-nights during April 20-23, 2006. The contract required Memory Travel to (1) pay a $250 deposit immediately; (2) provide a rooming list and pay the first night's deposit on or before March 31, 2006; and (3) remit the balance at check-in. In a series of addenda to the contract, Memory Travel agreed to pay Glenstone a total of over $64,000 for lodging, meeting space, food, entertainment, and other services. Memory Travel paid the $250 deposit.

In the ensuing months, Memory Travel collected approximately $33,000 from Redhatters. As early as October 2005, Carole realized she had undercharged the Redhatters and Memory Travel would be unable to pay for the Fling. Carole misspent nearly $9,600 and underestimated Memory Travel's costs, including expenses for entertainment and a large off-site lunch for the Redhatters. Carole decided not to tell Glenstone because she "did not feel it was their problem." Carole hoped to cover the shortfall by encouraging Redhatters to prepay for future Memory Travel events.

On March 15, 2006, Memory Travel sent a rooming list to Glenstone but did not pay the first night's lodging expenses by the March 31 deadline. On April 18, 2006, the Treadwells arrived in Gatlinburg for the Fling. Memory Travel did not pay the balance due under the contract, although Carole acknowledged the costs of Glenstone's services by signing a "trip resume" and initialing a series of invoices.

-3-

The Treadwells "kept offering [Glenstone] reasons why they couldn't finalize" the contract and promised to pay when they checked out. Glenstone's manager, Urcella House, testified Glenstone "expected [full payment] on the day of checkout," April 24, 2006. Glenstone supplied the Treadwells with room keys and a registration table, so Redhatters could check-in directly with the Treadwells in the hotel's lobby.

The Fling otherwise was a success. From April 17 to 24, 2006, Memory Travel booked 429 room-nights for more than 300 Redhatters, who hailed from at least twenty states, the United Kingdom, and Australia. Glenstone "did a beautiful job," "[e]verything went extremely well," and the Redhatters' reviews were "nothing but great." At the Fling's farewell breakfast, the Treadwells distributed a flyer imploring Redhatters to "sign up now with the Treadwells so that [the Redhatters] could get their dibs in . . . [and avoid] los[ing] out on . . . the next year."

On or about April 24, 2006, the Treadwells left without checking out, leaving a note, or notifying anyone of their departure and without settling the bill, which exceeded $60,000. For two days, Glenstone unsuccessfully attempted to contact the Treadwells via telephone, fax, and email. Glenstone needed to meet its payroll, which was particularly burdensome because it had employed additional staff and paid overtime to support the Fling.

On April 26, 2006, Carole sent Glenstone an email, explaining the Treadwells left the hotel without checking out and paying the bill because there was "a medical emergency and [the Treadwells] had to leave." Carole complained the bill contained minor errors, said that she was "dressing to take it to the bookkeeper for checking," and promised to "overnight $20,000.00 right now." Carole did not have a bookkeeper, and Glenstone did not receive a $20,000 check the next day.

Glenstone asked Carole about the missing check. Carole then promised to wire Glenstone $20,000, $15,000 that day and $5,000 the following Monday, in lieu of the check. Carole wired $15,000, but did not wire $5,000 on Monday.

Glenstone later received a $20,000 check in a FedEx package. The check was drawn from "The Treadwell Family Revocable Living Trust, Larry W. Treadwell, Carole E. Treadwell" (trust), and the FedEx package was addressed from Larry.[2] When Glenstone deposited the check, Carole had stopped payment on the check. Memory Travel never paid the remainder of Glenstone's bill.

### B.    Tennessee Lawsuit

Glenstone sued the Treadwells in Tennessee state court, alleging fraud, conversion, and breach of contract under Tennessee common law, as well as violations of various statutory provisions, including the Tennessee Consumer Protection Act of 1977 (TCPA), Tenn. Code Ann. § 47-18-101 et seq. Glenstone prayed for a $50,000 judgment and requested the judgment be trebled pursuant to the TCPA. The TCPA provides for treble damages when there is "a willful or knowing violation" of its terms. See Tenn. Code. Ann. § 47-18-109(a)(3).

When the Treadwells did not answer Glenstone's complaint, Glenstone moved for default judgment.[3] See Tenn. R. Civ. P. 55.01. After an evidentiary hearing which is not part of the record before us, the Tennessee state court entered judgment against the Treadwells and the trust in the amount of $153,611.44. This sum represents treble

---

[2]Carole testified she forged her husband's signature because she is "from the old school" and her "husband's name come[s] first on everything."

[3]The Treadwells deny receiving notice of the Tennessee lawsuit, even though the return of service purportedly bears their signatures. Carole testified someone forged her signature. The Treadwells have not moved to set aside service of process, and the bankruptcy court did not make findings of fact on the signature and notice issues.

the Treadwells' outstanding balance with Glenstone as of August 21, 2006, plus legal fees incurred in collection attempts to that date.[4]

Glenstone registered its Tennessee judgment in Missouri, placing a judicial lien on the Treadwells' Branson home. See Mo. Rev. Stat. § 511.350. Glenstone began proceedings to foreclose on its lien and a sheriff's sale was scheduled for September 2, 2008.

### C.    Bankruptcy

On August 27, 2008, the Treadwells filed for Chapter 7 bankruptcy, staying the foreclosure, see 11 U.S.C. § 362(a), and seeking discharge of their debt to Glenstone, see 11 U.S.C. § 727. The Treadwells then brought this adversary action against Glenstone to avoid Glenstone's lien as a preferential transfer. See 11 U.S.C. § 522(f)(1)(A). Glenstone answered and counterclaimed for a declaration that the Treadwells' debt was a non-dischargeable debt "for money, property, [or] services . . . obtained by . . . false pretenses, a false representation, or actual fraud." See 11 U.S.C. § 523(a)(2)(A).[5]

To prove non-dischargeability under § 523(a)(2)(A), a creditor ordinarily must show, by a preponderance of the evidence, (1) the debtor made a representation,

---

[4]Glenstone apparently presented the Tennessee state court with an exhibit detailing the balance owed under the contract with 10% interest ($51,158.82) and Glenstone's legal expenses ($1,342.98). The exhibit contains an obvious computational error, which the parties do not discuss.

[5]For purposes of this appeal only, we follow the parties' lead and conflate "false pretenses, a false representation, or actual fraud" into the singular concept of "fraud." Cf. Field v. Mans, 516 U.S. 59, 70 n.8 (1995); AT&T Universal Card Servs. v. Mercer (In re Mercer), 246 F.3d 391, 402-03 (5th Cir. 2001) (en banc); Kan. Bankers Sur. Co. v. Eggleston (In re Eggleston), 243 B.R. 365, 372-73 & nn. 8-10 (Bankr. W.D. Mo. 2000). We also note Glenstone, to our knowledge, no longer seeks a determination of non-dischargeability under 11 U.S.C. § 523(a)(4) or § 523(a)(6).

(2) with knowledge of its falsity, (3) deliberately for the purpose of deceiving the creditor, (4) who justifiably relied on the representation, which (5) proximately caused the creditor damage. See R & R Ready Mix v. Freier (In re Freier), 604 F.3d 583, 587 (8th Cir. 2010). If the creditor proves a partnership between two of its debtors, non-dischargeability may be imputed from one partner to the other. See Strang v. Bradner, 114 U.S. 555, 561 (1885). Under our precedent, imputation only is proper if the otherwise innocent debtor knew or should have known of his partner's fraud. See Walker v. Citizens State Bank of Maryville, Mo. (In re Walker), 726 F.2d 452, 454 (8th Cir. 1984) (per curiam).[6] Reckless indifference is evidence the innocent debtor should have known of the fraud. See id.

### 1. Trial

In April 2009, the bankruptcy court held a two-day trial to determine whether the Treadwells' debt to Glenstone was dischargeable.[7] Glenstone sought to prove

---

[6]Walker is controversial. See Nat'l Union Fire Ins. Co. v. Bonnanzio (In re Bonnanzio), 91 F.3d 296, 302 (2d Cir. 1996) ("Several . . . courts . . . have sharply criticized . . . the Eighth Circuit's decision in Walker as contrary to the legislative history and proper statutory interpretation of § 523."); 4 Alan N. Resnick & Henry J. Sommer, Collier on Bankruptcy ¶ 523.08[3] (16th ed. 2010) (discussing the legislative history and implying Walker is wrong on this point, and fraudulent intent of the debtor's agent or partner may be imputed to the debtor).

[7]Before trial, Glenstone moved for summary judgment, contending the Tennessee judgment estopped the Treadwells from denying their debt was non-dischargeable. See Grogan v. Garner, 498 U.S. 279, 284 n.11 (1991). Applying Tennessee law, see Allen v. McCurry, 449 U.S. 90, 96 (1980), the bankruptcy court denied the motion. On its own motion, the bankruptcy court questioned whether collateral estoppel would apply when the underlying judgment is a default judgment and the judgment "makes absolutely no findings" and does not identify "under which of the alternative theories pled . . . it was based." But see Lawhorn v. Wellford, 168 S.W.2d 790, 792 (Tenn. 1943) ("A judgment taken by default is conclusive by way of estoppel in respect to all such matters and facts as are well pleaded and properly raised, . . . and such issues cannot be relitigated in any subsequent action between the

Larry and Carole each defrauded Glenstone or, even if Larry did not defraud Glenstone, Larry was vicariously liable for Carole's fraud because the Treadwells were partners in Memory Travel.

At the conclusion of the evidence, the bankruptcy court repeatedly characterized the Treadwells as having a "partnership," but stated on the record the court doubted whether Glenstone could prove the fourth element of fraud, justifiable reliance, as to either Carole or Larry. The bankruptcy court also remarked that Larry was "not credible" insofar as Larry had testified "he basically knew nothing about any of this," but the bankruptcy court was unsure whether "that gets us anywhere because I don't have any evidence other than his partnership in the business directly linking him to these events, other than the fact that he was there." The bankruptcy court asked the parties to brief "whether [Larry] is liable for any fraud . . . based on simply . . . having legal responsibility as a partner in the business for the fraud or the false pretenses that were committed by [Carole]." The bankruptcy court stressed it would only reach this imputed fraud issue if the bankruptcy court found, as a predicate matter, Carole defrauded Glenstone.

In their post-trial brief, the Treadwells conceded that, if Glenstone were able to prove Carole defrauded Glenstone, the bankruptcy court "may impute [Carole's]

_____

parties."), adhered to, Rally Hill Prods., Inc. v. Bursack (In re Bursack), 65 F.3d 51, 54 (6th Cir. 1995) ("Even a default judgment satisfies Tennessee's 'actually litigated' requirement."). In the alternative, the bankruptcy court held summary judgment was inappropriate absent a transcript of the default judgment hearing, because it was unclear whether the Tennessee court found the Treadwells defrauded Glenstone. But see Patterson v. Rockwell Int'l, 665 S.W.2d 96, 101 (Tenn. 1984) ("The rule is that the defendant, by suffering a default judgment to be entered against him, impliedly confesses all of the material allegations of fact contained in his complaint, except the amount of the plaintiff's unliquidated damages."). Upon remand, at the bankruptcy court's discretion, this collateral estoppel issue may be reconsidered. See Hanig v. City of Winner, 527 F.3d 674, 678 (8th Cir. 2008).

misrepresentations to her business partner and co-debtor, Larry." The Treadwells insisted "it is not necessary that [Larry] knew or should have known of [Carole's] fraud in order to have [Carole's] fraud imputed." The Treadwells reasoned <u>Walker</u> "appears to still be the rule in the Eighth Circuit," but "post-<u>Walker</u>, a distinction has developed where the case involves actual fraud or misrepresentation of an agent acting within the scope of her employment or apparent authority."

The bankruptcy court issued a thorough opinion holding the Treadwells' debt to Glenstone was not excepted from discharge under 11 U.S.C. § 523(a)(2)(A). Stressing Geoffrion failed to testify, the bankruptcy court found Glenstone failed to prove justifiable reliance as to either Carole or Larry.[8] The bankruptcy court found Glenstone waived the contract's prepayment provisions and opined Glenstone "had many opportunities to protect itself, but for whatever reason, it did not." The bankruptcy court did not decide whether the Treadwells were partners in Memory Travel or, if so, whether such partnership would impute any putative fraud of Carole to Larry. Despite its oral statements on the record at the close of the evidence, the words "partner" and "partnership" do not appear in the bankruptcy court's written order.[9]

### 2. BAP

Glenstone appealed to the BAP, maintaining the Treadwells' debt to Glenstone was excepted from discharge under 11 U.S.C. § 523(a)(2)(A). As relevant here, Glenstone argued (1) the bankruptcy court erred in finding Glenstone did not

---

[8]The bankruptcy court also found Larry did not act with knowledge of falsity. Glenstone no longer challenges this finding.

[9]Because Glenstone "agreed that . . . its judgment lien would be avoidable if the debt were found to be dischargeable," the bankruptcy court held Glenstone's lien on the Treadwells' home was avoidable under 11 U.S.C. § 522(f)(1)(A). The lien avoidance issue is not before us at the present time, was not necessary to the BAP's decision, and we do not discuss it further.

justifiably rely on Carole's misrepresentations, and (2) the Treadwells were partners in Memory Travel, so Carole's fraud should be imputed to Larry. The Treadwells defended the bankruptcy court opinion. The Treadwells did not discuss the imputed fraud issue.

The BAP reversed in part and affirmed in part. The BAP reversed the bankruptcy court's determination that Carole's debt to Glenstone was dischargeable. The BAP held the bankruptcy court clearly erred in finding no justifiable reliance under the "minimal standard" set forth in Field v. Mans, 516 U.S. 59 (1995). Stressing the Fling appeared to be a complete success and there was no evidence in the record Carole had defrauded anyone before, the BAP held as a matter of law that there were no "obvious warning signs of falsity."

The BAP affirmed the bankruptcy court's determination that Larry's debt to Glenstone was dischargeable. Citing Sells v. Porter (In re Porter), 375 B.R. 822, 828 (B.A.P. 8th Cir. 2007) for the proposition that the BAP "may affirm the bankruptcy court's decision on any basis supported by the record," the BAP considered the imputed fraud issue. The BAP raised and ruled on imputed fraud despite the fact that: (1) the Treadwells had conceded the issue in the bankruptcy court, (2) the bankruptcy court had not decided the question, and (3) the Treadwells had not briefed this issue to the BAP. The BAP observed, "if [the bankruptcy court] had [analyzed the imputed fraud issue], the record would not have supported a finding that Larry was a partner in Carole's travel business." The BAP found:

> [T]here is no evidence of an actual partnership. Larry had no authority to control the business, did not believe himself to be a business partner, had no authority to act on behalf of the business, and apparently did nothing except help out at events, travel with Carole, and add his two cents about entertainment and logistics simply because he was there. Carole forged Larry's name on the fictitious name registration. His ownership interest was described by the Treadwells as a marital interest. In other words, because the Treadwells share equally in everything, they

considered Larry to be a fifty percent owner of the business, just as he was a fifty percent owner of the household furnishings. Carole rarely, if ever, talks to him about their income or expenses. He testified that he never pays any bills for the household or Memory Travel. Larry's name does not appear anywhere on the [contract]. Carole's e-mails do not suggest that anyone is helping her run the business. There is no evidence that Larry received a share of the profits, if there ever were any. There is no evidence that Larry ever represented to Glenstone that he was Carole's business partner. The record would not support a finding of partnership or agency.

In the alternative, the BAP found:

Under Walker, even if there had been evidence that Memory Travel was a partnership, it still would not be enough to support the nondischargeability of Larry's debt. Glenstone would have had to prove that Larry knew of Carole's fraud, should have known of Carole's fraud, or was recklessly indifferent to Carole's fraud, and the record does not support that finding. The bankruptcy [court] correctly concluded that there was no evidence that Larry knew of the fraud.

The BAP summarized its holding with respect to Larry as follows:

In conclusion, there is no legal basis for imputing Carole's fraud to Larry . . . . Although Larry and Carole considered Larry to be an equal owner of Memory Travel, and although he accompanied Carole on both the initial site visit and the [R]edhatter event, the evidence overwhelmingly supports the conclusion that he was oblivious to the operations of the business, merely tagged along with Carole at her request and helped out at her direction. The record would not support a finding that Larry and Carole had a partnership or agency relationship, or that Larry knowingly participated in the fraud or should have known of the fraud. We therefore affirm the bankruptcy court's determination that Larry's debt to Glenstone is dischargeable.

-11-

Glenstone appeals the BAP's affirmance of the bankruptcy court's determination that Larry's debt to Glenstone is dischargeable under § 523(a)(2)(A). Carole did not cross-appeal.

## II. DISCUSSION

### A. Standard of Review

"On appeal from a decision of the BAP, we act as a second reviewing court of the bankruptcy court's decision, independently applying the same standard of review as the BAP." McCarty v. Lasowski (In re Lasowski), 575 F.3d 815, 818 (8th Cir. 2009). We are obligated, as the BAP was, to "review[] the bankruptcy court's findings of fact for clear error and its conclusions of law de novo." Eilbert v. Pelican (In re Eilbert), 162 F.3d 523, 525 (8th Cir. 1998).

### B. Remand

The parties argue at length as to whether the BAP "erred in finding" Larry and Carole were not partners in Memory Travel and, even if there were a partnership, whether the BAP "erred in finding" Glenstone failed to prove Larry knew or should have known of Carole's fraud. The parties' arguments are misplaced, the BAP's role is to review, not make, factual findings. The BAP should have instructed the bankruptcy court to decide in the first instance whether the Treadwells were partners and, if so, whether Larry knew or should have known of Carole's fraud. We decline the parties' joint invitation to review the BAP's factual findings or make our own factual findings.

While it is true the BAP may affirm a bankruptcy court's decision on any basis supported by the record, see United States v. Pierson, 219 F.3d 803, 807 (8th Cir. 2000), this familiar principle of appellate procedure does not empower the BAP to make factual findings. When factual issues are incomplete or remain unsettled on an alternative issue the bankruptcy court did not reach, the BAP ordinarily should remand to the bankruptcy court for further factual findings. See, e.g., Pullman-Std.

v. Swint, 456 U.S. 273, 291-92 & n.22 (1982) ("When an appellate court discerns that a district court has failed to make a finding because of an erroneous view of the law, the usual rule is that there should be a remand for further proceedings to permit the trial court to make the missing findings."); Brown v. Mt. Prospect State Bank (In re Muncrief), 900 F.2d 1220, 1224 (8th Cir. 1990) (similar); Wegner v. Grunewaldt (In re Wegner), 821 F.2d 1317, 1320 (8th Cir. 1987) (similar).

The BAP itself should not have found Glenstone failed to prove the imputation of Carole's fraud to Larry, because the bankruptcy court did not decide[10] the underlying issues of partnership and intent, which turn on disputed facts, credibility determinations, and the inferences a fact finder may choose to draw therefrom. See In re Walker, 726 F.2d at 454 ("Whether a principal knew or should have known of his agent's fraud is, of course, a question of fact."). See also Agristor Credit Corp. v. Windle (In re Windle), 653 F.2d 328, 331 (8th Cir. 1981) ("The deference owed by appellate courts to finders of fact is at its highest where the issue turns on the resolution of a direct conflict between live witnesses."); Schneider v. Schneider, 146 S.W.2d 584, 587 (Mo. 1940) ("A partnership is a status; that is, it is a factual relationship between two or more persons who are conducting a business enterprise together. The central fact of that relation is community of ownership of the business.").[11] The parties' fact-intensive briefs amply support this point.

Walker is instructive. In Walker, the bankruptcy court denied discharge to a debtor under 11 U.S.C. § 523(a)(2)(A) after finding the debtor was his wife's agent and thus responsible for her fraud even though he did not know about it. Walker, 726 F.2d at 453. The district court reversed, holding the wife's fraud could not be imputed

_____

[10]This is not surprising, because the Treadwells conceded in the bankruptcy court that, if Carole defrauded Glenstone, imputation of Carole's fraud to Larry was proper.

[11]We need not and do not decide whether federal common law or Missouri law governs the threshold partnership inquiry.

to the debtor unless he knew or should have known of her fraud.  Id.  "The district court accepted without qualification the bankruptcy court's finding that [the debtor] did not know of his wife's fraud, noted the lack of clear showing that [he] should have known of it, and held that the debt was dischargeable."  Id.

We reversed and remanded to the bankruptcy court for further factual findings. Id. at 454-55.  We observed:

> Whether a principal knew or should have known of his agent's fraud is, of course, a question of fact. The question was not expressly decided by the bankruptcy court. The bankruptcy court believed that once it was shown that Mrs. Walker was her husband's agent, Mr. Walker's knowledge of the fraud was not crucial.

Id. at 454.

As in Walker, remand here is necessary because the bankruptcy court's factual findings are "not presently acceptable as decisive" of the imputed fraud issue.  See id. at 455.  The bankruptcy court did not rule on the imputed fraud issue and, in not doing so, did not squarely address whether there was a partnership or what Larry knew or should have known about the Fling.  With respect to Larry, the bankruptcy court discussed, in a series of incomplete factual findings, that (1) "Larry and Carole Treadwell are equal owners in a travel agency business known as Memory Travel"; (2) "although it is likely that [Larry] was also aware that they did not have the money to pay the bill, there was no actual evidence of that fact"; and (3) "although . . . Larry made implied representations about payment, unlike Carole, I cannot find that his representations were knowingly false."  Referring collectively to "the Treadwells," the bankruptcy court arguably implied Larry also (4) "promise[d] to pay" Glenstone "by one check when they checked out"; (5) made "repeated excuses for not complying with the" contract; (6) "sometimes used an account held in the name of the [trust] to operate Memory Travel"; and (7) "approved all charges for lodging and services."

-14-

This is not a case in which the record is clearly insufficient to impute Carole's fraud to Larry. We are unable to rule in Larry's favor as a matter of law and affirm the bankruptcy court on an alternative ground appearing in the record. Cf. Pierson, 219 F.3d at 807.

Consistent with the bankruptcy court's oral comments at trial, there is substantial evidence of a partnership between Carole and Larry in Memory Travel. Previously we have characterized registration of a fictitious name with the State of Missouri as part of "abundant written material evidencing [a p]artnership." Weston v. Donnelly, 927 F.2d 369, 372-73 (8th Cir. 1991). Memory Travel's registration form lists Larry as a 50% owner. The Treadwells' bankruptcy schedules say Memory Travel reported income and losses under Larry's social security number and do not reflect that Memory Travel was Carole's sole proprietorship.[12] There is evidence in the record from which the bankruptcy court could find Larry co-owned the trust, Memory Travel deposited its receipts into the trust, which was the Treadwells' primary source of income, and Larry received complimentary lodging for the Fling because of the large number of rooms Memory Travel booked.

Evidence also exists indicating Larry knew or should have known of Carole's fraud. A finding of partnership would constitute some evidence in itself. Further, one of Glenstone's managers, Urcella House, testified Larry was "actively engaged" in planning the Fling at a site visit in January 2006. Larry offered opinions about food choices, room sizes and locations, and other arrangements. House insisted "it was an effort of both of them" and not the case that "she did it all and he didn't."

House testified Larry and Carole were equally involved during the Fling. Larry coordinated with Glenstone's staff as the Fling progressed to ensure an enjoyable

---

[12]Carole testified the Treadwells had not filed federal or state tax returns since 1997. Larry said he did not know whether he had ever filed his taxes, remarking, "If she filed them, we have, if she didn't, then we haven't."

-15-

experience for the Redhatters. In House's words, Larry was not merely "following [Carole] around," but was present for all Fling events, wore a staff name tag, and entertained the Redhatters during the luau "buying drinks with wads of money." Rita Marshall, Glenstone's controller, testified she saw Larry coordinating events and activities at the Fling. Although the Treadwells testified Larry was not a partner in Memory Travel and did not know about Carole's fraud, a reasonable trier of fact may find the Treadwells' self-serving testimony incredible and may draw the inference the Treadwells were dissembling to hide the truth. Cf. Reeves v. Sanderson Plumbing Prod., Inc., 530 U.S. 133, 147 (2000). Indeed, the bankruptcy court *did* find Larry lacked credibility, and Carole does not appeal the BAP's ruling that she engaged in fraud.

## III.  CONCLUSION

We reverse and remand to the bankruptcy court for factual findings on the imputed fraud issue. On remand, the bankruptcy court retains the discretion to reopen the record and revisit the collateral estoppel issue. See Hanig, 527 F.3d at 678 (affirming the district court's decision to consider the collateral estoppel issue); Harker v. United States ex rel. IRS, 357 F.3d 846, 849-50 (8th Cir. 2004) (affirming the trial court's discretion on remand to reopen the record). The BAP's opinion of February 1, 2010 in this matter is vacated, with the exception of Part A.1 thereof. We do not retain jurisdiction.

_____